UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KHARI MOSLEY and CHELSA WAGNER,

       Plaintiffs,

v

MARRIOTT INTERNATIONAL, INC., a
Delaware corporation; CADILLAC HOTEL
FUNDING, LLC, a Delaware limited liability
company; CADILLAC HOTEL HOLDINGS,
LLC, a Delaware limited liability company;
WESTIN OPERATOR, LLC, a Delaware
limited liability company; DARRYL JONES,
individually; and TIMOTHY SCOTT,
individually,

       Defendants.

CASE NO. 2:21-cv-10470

HON.

_____

## COMPLAINT AND JURY DEMAND

      NOW COME plaintiffs Khari Mosley and Chelsa Wagner, by and through their attorneys,

Smith Haughey Rice & Roegge, and for their Complaint against defendants state as follows:

### JURISDICTION AND VENUE

      1.    The United States District Court for the Eastern District of Michigan has diversity

jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds the

sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

      2.    The United States District Court for the Eastern District of Michigan also has

jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the action arises under federal law.

      3.    Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to

U.S.C. § 1367(a) to hear and decide claims arising under state law that are so related to the claims

within the original jurisdiction of this Court that they form part of the same case or controversy

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

4.      Venue is proper pursuant to 28 U.S.C. § 1391 in that this is the judicial district in which the events giving rise to this cause of action occurred.

## THE PARTIES

5.      At all relevant times, plaintiff Khari Mosley (hereinafter "Mosley") has been a citizen of the State of Pennsylvania and has resided in Allegheny County, Pennsylvania.

6.      At all relevant times, plaintiff Chelsa Wagner (hereinafter "Wagner") has been a citizen of the State of Pennsylvania and has resided in Allegheny County, Pennsylvania, where she serves as the Allegheny County Controller.

7.      Upon information and belief, at all relevant times, defendant Darryl Jones (hereinafter "Jones") has been a citizen of the State of Michigan and has resided in Wayne County, Michigan.

8.      Upon information and belief, at all relevant times, defendant Timothy Scott (hereinafter "Scott") has been a citizen of the State of Michigan and has resided in Wayne County, Michigan.

9.      Upon information and belief, defendant Cadillac Hotel Funding, LLC (hereinafter "Funding") is a Delaware limited liability company with an established headquarters in Detroit, Michigan, and which conducts business in Wayne County, Michigan.

10.     Upon information and belief, defendant Cadillac Hotel Holdings, LLC (hereinafter "Holdings") is a Delaware limited liability company with an established headquarters in Detroit, Michigan, and which conducts business in Wayne County, Michigan.

11.     Upon information and belief, defendant Westin Operator, LLC (hereinafter "Westin") is a Delaware limited liability company with an established headquarters in Detroit, Michigan, and which conducts business in Wayne County, Michigan.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

2

12.     Upon information and belief, defendant Marriott International, Inc. (hereinafter "Marriott") is a Delaware corporation which conducts business in Wayne County, Michigan.

13.     At all relevant times, Funding owned, operated, managed, controlled, maintained, established policies for, and did business as The Westin Book Cadillac Detroit, a hotel in downtown Detroit (hereinafter the "hotel").

14.     At all relevant times, Holdings owned, operated, managed, controlled, maintained, established policies for, and did business as The Westin Book Cadillac Detroit, a hotel in downtown Detroit (hereinafter the "hotel").

15.     At all relevant times, Westin owned, operated, managed, controlled, maintained, established policies for, and did business as The Westin Book Cadillac Detroit, a hotel in downtown Detroit (hereinafter the "hotel").

16.     At all relevant times, Marriott actually and/or ostensibly owned, operated, managed, controlled, maintained, established policies for, and did business as The Westin Book Cadillac Detroit, a hotel in downtown Detroit (hereinafter the "hotel").

17.     At all relevant times, Jones was employed by and an agent of Funding and responsible to carry out the policies of Funding.

18.     At all relevant times, Jones was employed by and an agent of Holdings and responsible to carry out the policies of Holdings.

19.     At all relevant times, Jones was employed by and an agent of Westin and responsible to carry out the policies of Westin.

20.     At all relevant times, Jones was employed by and an agent of Marriott and responsible to carry out the policies of Marriott.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

21.     At all relevant times, Scott was employed by and an agent of Funding and responsible to carry out the policies of Funding.

22.     At all relevant times, Scott was employed by and an agent of Holdings and responsible to carry out the policies of Holdings.

23.     At all relevant times, Scott was employed by and an agent of Westin and responsible to carry out the policies of Westin.

24.     At all relevant times, Scott was employed by and an agent of Marriott and responsible to carry out the policies of Marriott.

25.     At all relevant times, no entities other than Marriott, Funding, Holdings, and Westin owned, operated, managed, controlled, maintained, or established policies for the hotel, or did business as The Westin Book Cadillac Detroit hotel.

## GENERAL ALLEGATIONS

26.     Mosley and Wagner are, and at all times relevant herein have been, an interracial married couple; Mosley is Black/African American and Wagner is White/Caucasian.

27.     Mosley and Wagner took a trip from their home in Pittsburgh, Pennsylvania to Detroit, Michigan to attend a special concert in Detroit on the evening of March 5, 2019.  The concert consisted of Nas, a rapper, performing with the Detroit Symphony Orchestra, which concert was part of celebrating Black History Month with the Detroit Pistons.  Proceeds from the event went toward programs supported by the Detroit Pistons partnership with the Detroit Symphony Orchestra.

28.     Before arriving in Detroit, the plaintiffs did online research regarding available hotels in Detroit and took note of the hotel.  All of the online marketing for The Westin Book Cadillac Detroit hotel, including the website for the hotel, indicates that the hotel is a Marriott

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

hotel, and would lead a viewer, and did lead the plaintiffs, to understand and conclude that the hotel is owned, managed, controlled, operated, and maintained by Marriott, and that Marriott policies and standards of excellence would be observed at the hotel.  Following their research, the plaintiffs secured a room through Priceline at the hotel.

29.    The website for the hotel promotes the Marriott brand and indicates that Marriott is the actual, ostensible or apparent proprietor of the hotel.

30.    During the process of securing a room through Priceline at the hotel, Wagner gave her name to secure the room for two occupants.  Payment of the room was made to Priceline on a debit card for the plaintiffs' joint account.

31.    The plaintiffs arrived at the hotel during the afternoon of March 5, 2019, and together went to the registration desk on the second floor to check-in.

32.    During the check-in process, two female clerks were working at the registration desk at the hotel.  One of the female clerks looked askance at the plaintiffs and asked abruptly if the plaintiffs were together.  The plaintiffs responded that they were married and were together.

33.    During the check-in process, Wagner requested that she and Mosley be accommodated in a room with a king size bed.  The hotel clerk abruptly and dismissively denied her request, stating that there were no rooms with king size beds available.

34.    Both Mosley and Wagner identified themselves and produced identification to the clerk at check-in.  The clerk gave each of them a room key to Room 1002.

35.    While the clerk properly noted on the registration that there were two occupants in Room 1002, the clerk neglected to add both names to the registration.  The clerk only noted the name of Chelsa Wagner on the registration and did not record the name of Khari Mosley on the

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

registration, even though Mosley provided his identification at the registration desk. The clerk seemed disapproving of the fact that they plaintiffs were an interracial couple.

36.     Upon information and belief, the standard operating procedure and policy at the hotel is for the clerk to, at a minimum, ask whether the occupants of the room wish to have both of their names on the registration. The clerk never made such inquiry, and never raised the subject of whose name or names would be on the registration. Had the clerk asked, the plaintiffs would have responded that the names of both plaintiffs should be on the registration.

37.     Upon information and belief, the standard in the industry is to make sure that the names of the adult occupants of the room are on the registration. The defendants utterly failed to reflect the names of both plaintiffs on the registration, even though both plaintiffs, including Mosley, provided identification to the clerk at the registration desk.

38.     At the time of the events set forth herein, the hotel had a policy to not make a replacement key available to any guest of the hotel whose name was not on the registration. That being so, it is important that the hotel exercise care to make sure that the names of all adult guests in the room are on the registration. The defendants failed to exercise such care in in this case.

39.     It is a frequent occurrence at the hotel that guests are separated from one another, or lose a key, or that a key card stops working, or that a guest is otherwise without a key to operate the elevator and gain access to the guest's room. At the time of the incidents described herein, a guest could not operate the elevator to gain access to room floors without a functioning key card. All of the defendants were aware of that fact.

40.     During the afternoon of March 5, 2019, Khari Mosley used his key card to go to the exercise room at the hotel and work out. Unfortunately, he left his key card in his work out shorts.

41.     During the evening of March 5, 2019, the plaintiffs attended the concert and had a wonderful time.  They had dinner after the concert and returned to the hotel at approximately 10:52 pm.  Both were exhausted from a long day of travel and activity.  Ms. Wagner decided to go to their room, 1002, and go to sleep.  Mr. Mosley decided to go to one of the hotel's restaurants, 24 Grille, and have a glass of wine.

42.     Mosley went to 24 Grille and had one glass of wine which he billed to his room number 1002.  Attached as **Exhibit 1** is a copy of the hotel folio documenting that the hotel allowed Mosley to bill his glass of wine to his room.

43.     **Exhibit 1**, the hotel folio, indicates that Marriott is the actual, ostensible, or apparent proprietor of the hotel.

44.     While at 24 Grille, Mosley realized that he did not have his room key.  He telephoned Wagner on her cell phone and advised her of this fact, and she agreed to use the latch on the door and prop open the door for him so he could get into the room.  Wagner indicated to Mosley that she was going to go to sleep.

45.     A short time later, Mosley left 24 Grille and went to the elevator and pressed 10 for his floor.  He realized then that he needed a key card to access the 10th floor.

46.     Mosley then went to the front desk and spoke with the front desk clerk on duty, Dovlet Shyhmyradov (hereinafter "Shyhmyradov"), and explained that he needed a key to access the elevator so that he could get into his room.  He told Shyhmyradov that he was a guest of the hotel staying in Room 1002, that his wife, Chelsa Wagner, was in Room 1002, and he identified himself by name and produced identification for Shyhmyradov.  Shyhmyradov checked the registration on the computer and advised Mosley that since his name was not on the registration

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

he could not give him a key.  Mosley became concerned about how he would get upstairs to his room and had discussion with Shyhmyradov.

47.    Hotel employee, Erika Drew (hereinafter "Drew"), working nearby, heard the discussion between Shyhmyradov and Mosley and came out to speak with Mosley.  Mosley repeated to Drew what he had told Shyhmyradov, including that he was a guest of the hotel, he was trying to get to his room, and that his wife was in the room.  Drew stated that calls had been made to the room on the hotel phone, but Wagner did not answer.  Drew repeated what Shyhmyradov told Mosley, which was that since his name was not on the registration they would not give him a key.  The only offer of assistance made by Shyhmyradov and/or Drew was to charge his cell phone, and Mosley declined because he knew that his wife was a very sound sleeper and would not hear any phone.

48.    Mosley became frustrated during his discussion with Drew.  Drew at the time was the night audit lead and the supervisor on duty.  Mosley requested that the hotel take him to the room with a hotel escort, that that request was denied.  Mosley also requested that someone from the hotel go up to the room and speak with Wagner while he waited downstairs, and that request was denied.  Mosley asked what his options were, and no options were provided to him by Drew. At the conclusion of this discussion with Drew, Drew told Mosley he would have to leave the hotel premises.

49.    Shyhmyradov and Drew together spent less than three minutes speaking with Mosley at the registration desk before Drew instructed Mosley that he had to leave the hotel.  Had Mosley's name been on the hotel registration, Shyhmyradov and/or Drew would have given him a key to Room 1002.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

8

50.     Drew's instruction to Mosley that he had to leave the hotel was outrageous.  Drew knew or should have known he was a guest at the hotel.  She knew or should have known he was not a vagrant.  She knew or should have known that the registration identified that the room was registered to a female who Mosley identified as his wife.  She knew or should have known that he belonged in that room and that she should help him get to his room.  Instead, she put him out of the hotel.

51.     During his discussion with Drew, Mosley requested that she call the police in the hope the police could help him get to his room.  Drew did not call the police.

52.     At the conclusion of his short discussion with Drew, hotel security officers Darryl Jones and Timothy Scott appeared and began to interact with Mosley for the sole purpose of ejecting him from the hotel.  Without making any effort to problem solve and to help Mosley, Drew turned the situation over to the security officers.  Drew neglected to tell the security officers that Mosley was a paying guest of the hotel.  She let the security officers believe that he was a vagrant who needed to be ejected from the hotel.  Indeed, the security officers believed Mosley was a vagrant and should be put out of the hotel without further ado.  Once the security officers became involved, they had only one goal in mind, and that was to put Mosley out of the hotel.

53.     The hotel security officers, Jones and Scott, concluded Mosley was a vagrant because he was Black, with a beard, wearing a red jumpsuit with tennis shoes.

54.     Jones and Scott escorted Mosley to the exit of the hotel and required him to leave.  Mosley was bewildered, confused, shocked, and frustrated that he was being treated so badly and that he was being treated as a vagrant.

55.     At various points, Mosley walked around outside of the hotel to gather his thoughts about what he should do next.  At the time he was put out of the hotel, it was 9°F and snowing.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

56.    Mosley returned to the hotel because he had no place else to go and because he had paid for Room 1002, his personal belongings were in Room 1002, his wife was in Room 1002, and he belonged in Room 1002.

57.    The hotel security officers, Jones and Scott, put Mosley out of the hotel multiple times.  After being outside walking about in the cold, Mosley returned to the hotel each time, insisting he was a guest at the hotel and pleading for the security officers to help him get to his room.  He repeatedly asked that someone from the hotel go up to Room 1002 and contact his wife. His multiple pleas for help went unanswered because the security officers believed he was a vagrant and had no business being in the hotel.

58.    Mosley's interactions with the security officers, Jones and Scott, occurred at various locations.  At one point, he spoke to them for a period of minutes while sitting on a bench across from the registration desk, pleading for someone to help him and solve this problem.  He again asked that someone from the hotel go up to Room 1002 and contact his wife.  Again, his pleas for help went unanswered.

59.    Mosley also interacted with the security officers, Jones and Scott, in the lower lobby of the hotel, and outside of the hotel.  Jones and Scott were rude and aggressive as they repeatedly put Mosley out of the hotel, and at several points assaulted and/or battered him.  Jones and/or Scott assaulted and battered Mosley by doing the following:

    a.    Pushing a revolving door on him;

    b.    Putting a finger in his face in a threatening manner;

    c.    Rushing and chest bumping him;

    d.    Balling up fists and threatening to hit him; and

    e.    Pushing him while he was carrying luggage.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

60. At one point, security officer Scott called 911 and requested the Detroit Police Department to come to the scene. During that call, Scott lied to the police and told them that Mosley was harassing employees and guests, that Scott feared for his life, and that Mosley may have a weapon because he kept going to his pocket.

61. Shortly thereafter, two police cars, each with two officers, arrived at the hotel. Defendant Jones lied to the police officers by telling them that Mosley had hit someone.

62. As a result of the false reports and statements by defendants Jones and Scott to the police officers, the police officers immediately took a position adverse to Mosley and concluded Mosley was the problem and a threat when in fact the hotel, its staff and its security officers were the problem.

63. The lead police officer, Edmond Witcher (hereinafter "Witcher"), concluding Mosley was the problem and a threat based upon statements from the hotel security officers, detained Mosley by putting him in the back of a police car under the supervision of two officers. In the course of putting Mosley in the police car, Witcher accused Mosley of engaging in "stupid shit."

64. While Mosley was detained in the police car, and was unable to exit the police car, Officer Witcher, accompanied by fellow police officer, Jonathan Glowacki (hereinafter "Glowacki"), entered the hotel and went to the front desk and spoke with the managing supervisor on duty, Erica Drew, and asked for permission to go to Room 1002, which was readily given. Officer Witcher asked Drew if Mosley was still welcome to stay in the hotel and Drew indicated that he was. Although Mosley had been visibly frustrated and agitated, no behavior engaged in by Mosley disqualified him for continuing his stay as a guest of the hotel.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

11

65.     Officers Witcher and Glowacki, in the company of hotel security staff, then went to Room 1002 and spoke to Wagner, who was sound asleep, and confirmed that Mosley had his belongings in the room and belonged in the room.

66.     While Officers Witcher and Glowacki went to Room 1002, Mosley remained detained in the police car speaking with the two officers assigned to supervise him, Officers Boyd and Benavides.  During that discussion, one or both of those officers indicated to Mosley that they believed the report that he had hit someone and had been engaging in threatening behavior.  That scared Mosley.  As a Black man in America, Mosley was concerned about being harmed by the police.

67.     A short while later, Officer Witcher returned to the police car and removed Mosley and proceeded, with Officer Glowacki and the hotel security officers, to escort Mosley to his room, Room 1002.  Mosley, concerned about the officers believing he was a threat, put his hands up and declared that he was not a threat during the walk from the police car to his room.

68.     During the walk from the police car to his room, Mosley complained to the police officers and defendants Jones and Scott about how everyone had treated him as a "second class citizen," how he has not been treated as an "African American brother" who has "been here for 400 years," how he had his Constitutional rights violated, and how he had been "detained" by defendants.

69.     A new participant to the group, hotel manager on duty, Christopher Holmes (hereinafter "Holmes"), became involved.

70.     Holmes, Drew, and Shyhmyradov were employees and agents of Marriott and/or Funding and/or Holdings and/or Westin, and were responsible for carrying out the policies of those entities.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

12

71.     Once Mosley approached and entered Room 1002 to be reunited with his wife, Mosley threatened to sue the defendants.  After Mosley stated he was going to sue, Jones and/or Scott and/or Holmes directed the police officers to "put him out."  Mosley and Wagner then closed the door of Room 1002, and the group of police officers and Jones, Scott, and Holmes turned around and walked only a few steps back down the hall toward the elevator, before the group decided to go back to the room to retaliate against Mosley for the comments he made about the deplorable and unlawful treatment of him and the threats of legal action.

72.     The group has claimed that they decided to go back to the room because they heard a loud bang or kick or other extraordinary noise coming from within the room.  In fact, there was no loud bang or kick or other extraordinary noise inside the room.  The claim of a loud bang or kick or other extraordinary noise coming from the room was a pretext to further harass and violate the rights of Mosley and Wagner, and retaliate against them.

73.     After returning to the room, the police officers, the hotel security officers, and Holmes advised Mosley and Wagner that they would both have to leave the hotel.

74.     After returning to the room, Holmes and the security officers focused on Mosley and decided to once again put Mosley out of the hotel and requested and enlisted the assistance of Officers Witcher and Glowacki, to assist in that effort.  The decision to put Mosley out of the hotel at that point was made by Holmes and/or other hotel employees, including security officers Jones and/or Scott.

75.     Both Mosley and Wagner were terrified about what would become of them, and feared for their own and each other's well-being and safety.  Wagner asked where Mosley would go and was told that it was none of her business.  At that point, acting on the direction of Holmes and/or other hotel employees, including Jones and/or Scott, the police officers handcuffed Mosley,

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

removed him from the room, detained him, took him into custody, and escorted him down the elevator and out of the hotel.

76.    As the officers were leading Mosley down the hallway in handcuffs, Wagner followed them and videotaped the procedure.  At some point, Wagner was told that she could accompany her husband out of the hotel.  When they reached the elevator, Wagner initially got on the elevator to accompany her husband down the elevator but was ordered off by Officer Witcher.  After exiting the elevator, Officer Witcher retaliated against Wagner for comments she made and videotaping the process and used excessive force by throwing her to the ground and handcuffing her, causing her to suffer multiple bruises, scrapes, and a shoulder injury.  Officer Witcher, then trying to justify his behavior, arrested Wagner claiming she had assaulted him and took her to jail.

77.    Mosley was escorted out of the building and, with the exception of allowing him to come back in briefly to recover personal belongings, stayed elsewhere for the balance of the night.  Mosley was not arrested.

78.    Misguided criminal charges were brought against both Mosley and Wagner, and both went through full separate jury trials.  Defendants and their agents assisted in the prosecution of these cases.  Mosley was acquitted on all charges.  Wagner was acquitted on all but one charge, which later was reduced to the lowest misdemeanor possible and resolved.

79.    The news media reported on these incidents and the trials.  Mosley and Wagner have suffered substantial damage to their good names and reputations.

80.    All of the trauma, tumult, events, injuries, and harms set forth herein flowed and resulted from the conduct, acts, and omissions of the defendants and were entirely foreseeable by defendants.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

81.    As a proximate result of defendants' conduct, breaches, violations, retaliation, negligence, and other acts and omissions as set forth herein, Mosley and Wagner have suffered fright, shock, fear, humiliation, embarrassment, violation of civil rights, mental distress, physical and emotional pain and suffering, bodily injury, loss of companionship with each other and their children, financial expenses and losses, damage to reputation, and other direct and consequential damages.

82.    Plaintiffs Mosley and Wagner seek and are entitled to recover compensatory damages and exemplary damages, and punitive damages to the extent allowed, as a result of the physical, mental, emotional, and psychological injuries and harms they have experienced, together with costs, interest, and attorney fees.

## STATEMENT OF CLAIMS

### COUNT I – Discrimination Under the Michigan Elliott-Larson Civil Rights Act

83.    Plaintiffs incorporate by reference all preceding paragraphs.

84.    The Westin Book Cadillac Detroit hotel is a place of public accommodation, as defined in Michigan's Elliott-Larsen Civil Rights Act (the ELCRA), MCL 37.2301, which is owned and operated by defendants Marriott, Funding, Holdings, and Westin.

85.    The hotel clerk who checked Mosley and Wagner into Room 1002 is a person, as that term is defined in the ELCRA, and is an agent of defendants Marriott, Funding, Holdings, and Westin.

86.    Erica Drew and Dovlet Shyhmyradov are persons, as that term is defined in the ELCRA, and are agents of defendants Marriott, Funding, Holdings, and Westin.

87.    Defendant Darryl Jones is a person, as that term is defined in the ELCRA, and is an agent of defendants Marriott, Funding, Holdings, and Westin.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

88. Defendant Timothy Scott is a person, as that term is defined in the ELCRA, and is an agent of defendants Marriott, Funding, Holdings, and Westin.

89. Defendants violated the ELCRA and deprived Mosley and Wagner of their civil rights by, among other things:

    a. The hotel clerk excluded Mosley from being added in the hotel's records as a registered guest in Room 1002, even though the reservation was for two occupants and Mosley provided his identification, and contrary to the standard operating procedure and policy for the hotel, because Mosley and Wagner were an interracial couple;

    b. The hotel clerk, in excluding Mosley from being added as a registered guest in Room 1002 in the hotel's records, denied Mosley and Wagner, an interracial couple, with services and accommodations provided to other guests who are couples of the same race;

    c. The hotel clerk, even knowing that it is a frequent occurrence at the hotel that guests are without a key needed to operate the elevator and gain access to the guest's room (and need to secure a replacement key), excluded Mosley from being identified as a registered guest in the hotel's records, because Mosley and Wagner were an interracial couple;

    d. Erica Drew and Dovlet Shyhmyradov denied services and accommodations to Mosley by refusing all reasonable requests to solve the problem of him being unable to access his hotel room, because of his race;

    e. Drew and Shyhmyradov called and/or allowed hotel security to eject Mosley without bothering to take minimal measures to ascertain whether he was a hotel guest, because of his race;

    f. Defendants Jones and Scott concluded that Mosley was a vagrant and aggressively ejected Mosley from the hotel multiple times, assaulting and battering him, because of his race.

    g. Defendants Jones and Scott lied to the Detroit Police Department in telling them that Mosley had was engaging in harassing behavior, that he may have a weapon, that they feared for their lives, and that Mosley had hit someone, because of his race;

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

      h.    Defendants denied Mosley and Wagner the full and equal enjoyment of the services, facilities, privileges, advantages and accommodations of the hotel because of race and interracial marriage.

90.    Defendants owed plaintiffs duties under the ELCRA, MCL 37.2101 et seq. Those duties included not to discriminate against plaintiffs on the basis of race or interracial marriage.

91.    Defendants violated their duties to plaintiffs under the ELCRA.

92.    As a proximate result of defendants' violations of their duties under the ELCRA, Mosley and Wagner have suffered fright, shock, fear, humiliation, embarrassment, violation of civil rights, mental distress, physical and emotional pain and suffering, bodily injury, loss of companionship, damage to reputation, and other direct and consequential damages.

93.    As a further proximate result of defendant's violations of their duties under the ELCRA, Mosley and Wagner lost the value and benefit of defendants Marriott, Funding, Holdings, and Westin's public service and accommodation.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## COUNT II – Retaliation Under the Michigan Elliott-Larson Civil Rights Act of 1964

94.    Plaintiffs incorporate by reference all preceding paragraphs.

95.    Mosley opposed defendants' denial of services and accommodations to him as described above, defendants' act of ejecting him, defendants' assault and battery of him, and the false reports and statements by defendant Jones and Scott to the police officers, by complaining about how defendants had treated him as a "second class citizen," how he had not been treated as an "African American brother" who has "been here for 400 years," how his Constitutional rights had been violated, how he had been "detained" by defendants.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

96. Mosley opposed defendants' discriminatory acts as described above, by stating that he was going to sue defendants.

97. Mosley opposed defendants' discriminatory acts as described above, based upon his good faith belief that they were unlawful.

98. In retaliation for Mosley's complaints and statements in opposition to their discriminatory acts, defendants detained and ejected Mosley and Wagner from the hotel. Defendants and their agents also retaliated against Mosley and Wagner by assisting in the prosecution of the criminal charges and cases brought against plaintiffs.

99. As a proximate result of defendants' violations of their duties under the ELCRA, Mosley and Wagner suffered fright, shock, fear, humiliation, embarrassment, violation of civil rights, mental distress, physical and emotional pain and suffering, loss of companionship, damage to reputation, and other direct and consequential damages.

100. As a further proximate result of defendant's retaliation in violation of the ELCRA, Mosley and Wagner have suffered fright, shock, fear, humiliation, embarrassment, violation of civil rights, mental distress, physical and emotional pain and suffering, bodily injury, loss of companionship, damage to reputation, and other direct and consequential damages.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## COUNT III – Violation of 42 U.S.C. § 1981

101. Plaintiffs incorporate by reference all preceding paragraphs.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

102.    42 U.S.C. §1981 prohibits discrimination on the basis of race and color in the making and enforcement of contracts.  § 1981 specifically defines the term "make and enforce contracts" to include the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

103.    Mosley and Wagner were parties to a contract with defendants Funding, Holdings, Westin, and Marriott, wherein as paying guests, Mosley and Wagner were to be able to enjoy all the benefits, privileges, terms, and conditions of staying at the hotel.

104.    As described in preceding paragraphs, defendants Marriott, Funding, Holdings, and Westin, through their employees and agents, excluded Mosley from being identified as a registered hotel guest in the hotel records, because Mosley and Wagner were an interracial couple.

105.    As described in preceding paragraphs, defendants Marriott, Funding, Holdings, and Westin, through their employees and agents, denied services and accommodations to Mosley by refusing all reasonable requests to solve the problem of him being unable to access his hotel room, and by ejecting him, because of his race and color.

106.    As described in preceding paragraphs, defendants Marriott, Funding, Holdings, and Westin, through their employees and agents, concluded that Mosley was a vagrant, assaulting and battering him, because of his race and color.

107.    As described in preceding paragraphs, defendants Marriott, Funding, Holdings, and Westin, through their employees and agents, lied to the Detroit Police Department in telling them that Mosley was engaging in harassing behavior, that he may have a weapon, that they feared for their lives, and that Mosley had hit someone, because of his race and color.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

108.     Defendants denied Mosley and Wagner the full and equal enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship with defendants Marriott, Funding, Holdings, and Westin, because of their races and colors, and their interracial marriage.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## **COUNT IV – Negligence**

109.     Plaintiffs incorporate by reference all preceding paragraphs.

110.     Under Michigan law, a special relationship exists between an innkeeper and their guests, mandating a heightened standard of care. One who operates a hotel has the responsibility of using reasonable and proper care for the safety and well-being of the establishment's patrons. Further, a hotel owner, operator, and manager has the duty to their guests, to provide aid and assistance not available to general public.

111.     Defendants Marriott, Funding, Holdings, and Westin and their employees and agents breached their duties and the applicable standard of care that was owed to Mosley and Wagner, who were hotel guests, by among other things:

   a.     Failing to properly train and supervise its employees and staff, including the hotel staff at check-in and Shyhmyradov, Drew, Jones, Scott, and Holmes;

   b.     Failing to adopt proper and reasonable rules and policies to assist guests, like Mosley, without a room key.

   c.     Failing to add Mosley as a registered guest in Room 1002 during the check-in process, even though Mosley provided his identification, and contrary to the standard operating procedure and policy for the hotel;

   d.     Failing to warn or advise Mosley and Wagner at check-in that they would not be able to secure a replacement room key if they lost or

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

became separated from their room key and their name was not included as a registered guest;

e.   Failing at check-in to comply with the standard operating procedure and policy of the hotel to ask Mosley and Wagner whether they wanted both names shown as registered guests;

f.   Drew and Shyhmyradov failing to reasonably consider Mosley's requests, as a hotel guest, to solve the problem of him being unable to access his hotel room;

g.   Drew and Shyhmyradov failing to communicate to security personnel that Mosley was a paying guest of the hotel, and carelessly allowing the security officers to believe that he was a vagrant who needed to be ejected from the hotel;

h.   Defendants Jones and Scott failing to reasonably listen to Mosley's repeated insistence that he was a guest at the hotel and his pleas for the security officers to help him;

i.   Defendants Jones and Scott lying to the police and failing to provide the Detroit Police Department with accurate information in the 911 call and upon the arrival of officers at the hotel, including with respect to baseless allegations that Mosley had engaged in threatening behavior, that he may be armed, and that he had hit someone;

j.   Holmes' continual failure to communicate in any reasonably clear manner with Wagner and/or Mosley, as paying hotel guests, about the hotel's position as to whether either or both guests would be ejected, upon realizing that Mosley was a paying guest and calling upon the Detroit Police;

k.   Holmes' unreasonable and continual failure to provide clear direction to security staff and police officers as to whether or not to eject Wagner and/or Mosley;

l.   Holmes and/or Jones and/or Scott directing the police officers to put Mosley and Wagner out of the hotel;

m.   Failing to give Mosley a replacement key when he requested one;

n.   Failing to allow Mosley to go to Room 1002 with a hotel escort;

o.   Failing to send someone from the hotel to Room 1002 to have contact with Wagner;

p.   Failing to conduct a well-being check on Wagner in Room 1002;

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

21

q.    Failing to call police when Mosley initially requested Drew to do so;

r.    Failure to invite or allow Mosley to stay in another guest room at the hotel; and

s.    Failure to otherwise exercise reasonable care for the safety and well-being of hotel guests Mosley and Wagner, and act as a reasonable hotel would under the same or similar circumstances.

112.    As a result of defendants' breach of their duties and the applicable standard of care, Mosley and Wagner suffered foreseeable economic and non-economic damages, including but not limited to:

a.    Injuries to Wagner's shoulder, and significant bruising and scrapes of multiple areas upon Wagner's body;

b.    Medical expenses;

c.    Physical, mental, emotional, and psychological pain and suffering;

d.    Fright, shock, fear, humiliation and embarrassment;

e.    Loss of companionship;

f.    Loss of enjoyment of life;

g.    Significant reputational damages; and

h.    Other direct and consequential damages.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## **COUNT V – Intentional Inflection of Emotional Distress**

113.    Plaintiffs incorporate by reference all preceding paragraphs.

114.    Defendants' acts to eject Mosley from the hotel after he explained that he was a guest that left his key in his room were extreme and outrageous.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

22

115.    Defendants' dismissal of Mosley's request for help and turning him over to hotel security officers within less than three minutes of him explaining to Drew and Shyhmyradov that he was a guest at the hotel, was extreme and outrageous.

116.    Defendants recklessly disregarded whether distress would result when they dismissed Mosley and called security, or allowed security, to eject him.

117.    As a result of defendants' extreme and outrageous acts described above, Mosley and Wagner suffered severe emotional distress.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## COUNT VI – Assault and Battery

118.    Plaintiffs incorporate by reference all preceding paragraphs.

119.    Defendants Jones and Scott assaulted and battered Mosley by doing the following:

    a.    Pushing a revolving door on him;

    b.    Putting a finger in Mosley's face in a threatening manner;

    c.    Rushing and chest bumping him;

    d.    Balling up fists and threatening to hit him; and

    e.    Pushing him while he was carrying luggage.

120.    The conduct of defendants Jones and Scott was intentional and unlawful, and undertaken for the purpose of threatening, intimidating, and harming Mosley, which it did.

121.    The threats to Mosley were made under circumstances that created in him a well-founded fear of imminent peril, as defendants Jones and Scott had the apparent ability to cause Mosley serious bodily harm.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

122.    Defendants Marriott, Funding, Holdings, and Westin are liable to plaintiffs for the assault and battery committed by Jones and Scott.  Liability for the assault and battery committed by Jones and Scott is imputed to their employers and principals, Marriott, Funding, Holdings, and Westin.

123.    As a direct and proximate result of defendants Jones and Scott's assault and battery of Mosley, plaintiffs suffered the damages outlined above, including emotional distress, fright, shock, fear, humiliation, and embarrassment.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## COUNT VII – Negligent Infliction of Emotional Distress

124.    Plaintiffs incorporate by reference all preceding paragraphs.

125.    Both Mosley and Wagner were either present at the time, or suffered shock fairly contemporaneous with, the incidents described above, where bodily injuries were threatened and/or inflicted upon their spouse.

126.    The injuries and harms inflicted upon Wagner were serious.

127.    The injuries and harms inflicted and threatened upon Mosley were serious.

128.    As a direct and proximate result of the injuries defendants inflicted and/or threatened upon Mosley and Wagner, plaintiffs suffered shock, which shock has been manifested physically in the loss of sleep, stress, and in other ways.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## COUNT VIII –False Arrest

129.    Plaintiffs incorporate by reference all preceding paragraphs.

130.    As a result of the false reports and statements by defendants Jones and Scott to the police officers, the police officers immediately took a position adverse to Mosley upon arriving at the hotel.

131.    The police officers acted upon the judgment of Jones, Scott, and Holmes, who were acting as employees and agents of defendants Marriott, Funding, Holdings, and Westin, in putting Mosley in the back of the police car under the supervision of the two officers, and in handcuffing Mosley and escorting him out of the hotel.

132.    Mosley was subject to the actual control and will of the police officers, by being placed in the back of the police car and by being handcuffed and escorted out of the hotel.

133.    While Mosley was in the back of the police car, he was unable to exit the car, and his liberty was restricted.

134.    While Mosley was in the back of the police car, Officers Boyd and Benavides questioned him regarding the events which led to the police being called.

135.    The placing of Mosley in the back of the police car was an unlawful detention, carried out at the direction and upon the judgment of defendants Jones and Scott who were agents and employees of defendants Marriott, Funding, Holdings, and Westin.  Mosley was also subject to the actual control and will of the police officers by being handcuffed and escorted out of the hotel.

136.     While Mosley was handcuffed and being escorted out of the hotel, he was unable to exit the control of the police officers, and his liberty was restricted.

137.     The placing of Mosley in handcuffs and being escorted out of the hotel by the police was an unlawful detention, carried out at the direction and upon the judgment of Holmes, Jones, and Scott, who were agents and employees of defendants Marriott, Funding, Holdings, and Westin.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.

## COUNT IX – False Imprisonment

138.     Plaintiffs incorporate by reference all preceding paragraphs.

139.     Defendants Jones and Scott, acting within the course and scope of their employment and/or agency with defendants Marriott, Funding, Holdings, and Westin, made false statements to the police officers with the intention of causing the police officers to restrain Mosley and deprive him of his liberty and freedom.

140.     Defendants Jones, Scott, and Holmes, acting within the course and scope of their employment and/or agency with defendants Marriott, Funding, Holdings, and Westin, instigated the false imprisonment of Mosley.

141.     While Mosley was confined in the police car, he was deprived of his personal liberty and freedom of movement.

142.     While Mosley was confined in the police car, he was conscious of his confinement.

143.     While Mosley was confined in handcuffs and being escorted by the police out of the hotel, he was deprived of his personal liberty and freedom of movement.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

144.    While Mosley was confined in handcuffs and being escorted out of the hotel by the police, he was conscious of his confinement.

145.    Defendants' actions directly resulted in the unlawful confinement of Mosley against his will, and without probable cause.

Wherefore, plaintiffs request that this Court enter judgment in their favor against defendants, jointly and severally, for all compensatory damages, exemplary damages, punitive damages, and equitable and injunctive relief to which the Court finds them entitled, together with costs, interest, and attorney fees.


DATED:  March 1, 2021                    By:  /s/ E. Thomas McCarthy, Jr.
                                              E. Thomas McCarthy, Jr. (P28714)
                                              Charissa C. Huang (P75501)
                                              SMITH HAUGHEY RICE & ROEGGE
                                              Attorneys for Plaintiff
                                              100 Monroe Center NW
                                              Grand Rapids, MI 49503
                                              616-774-8000
                                              tmccarthy@shrr.com
                                              chuang@shrr.com


**<u>JURY DEMAND</u>**

Plaintiffs, Khari Mosley and Chelsa Wagner, demand a trial by jury of the issues in this case.


DATED:  March 1, 2021                    By:  /s/ E. Thomas McCarthy, Jr.
                                              E. Thomas McCarthy, Jr. (P28714)
                                              Charissa C. Huang (P75501)
                                              SMITH HAUGHEY RICE & ROEGGE
                                              Attorneys for Plaintiff
                                              100 Monroe Center NW
                                              Grand Rapids, MI 49503
                                              616-774-8000
                                              tmccarthy@shrr.com
                                              chuang@shrr.com

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

SHRR\5128060.v1