UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KHARI MOSLEY, et al.,

     Plaintiffs,

v.

MARRIOT INTERNATIONAL, INC.,
et al.,

     Defendants.

Case No. 21-cv-10470

Honorable Linda V. Parker

---

## OPINION AND ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 69) AND PLAINTIFFS' MOTION FOR SANCTIONS (ECF NO. 86)

This matter is before the Court on the Motion for Partial Summary Judgment (ECF No. 69) filed by Defendants Marriott International, Inc. ("Marriott"), Cadillac Hotel Funding, LLC ("Cadillac Funding"), Cadillac Hotel Holdings, LLC ("Cadillac Holdings"), Westin Operator, LLC ("Westin"), Darryl Jones, Timothy Scott, Cadillac Funding Associates, LLC ("CFA"), Nyyota Holmes, Shauna Burton, Starwood Hotel and Resorts Worldwide, LLC ("Starwood"), and Hotel Investors of Michigan, Inc. ("HIM") (collectively "Defendants"), and the Motion for Sanctions (ECF No. 85) filed by Plaintiffs Khari Mosley ("Plaintiff Mosley") and Chelsa Wagner ("Plaintiff Wagner") (collectively "Plaintiffs"). The Court held oral argument on the motions on November 29, 2023. For the reasons that

follow, Defendants' motion is granted in part and denied in part and Plaintiffs'

motion is denied.

## I.     Applicable Standard

### Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is

appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The central inquiry is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56

mandates summary judgment against a party who fails to establish the existence of

an element essential to that party's case and on which that party bears the burden

of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine

issue of material fact." *Id*. at 323. Once the movant meets this burden, the

"nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To

demonstrate a genuine issue, the nonmoving party must present sufficient evidence

upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor.  *See id.* at 255.

"'There is, however, an added wrinkle' where the record contains 'a videotape capturing the events in question.'"  *Shumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  As the Sixth Circuit summarized in *Shumate*:

> Because facts must be viewed in the light most favorable to the non-moving party only if there is a genuine dispute as to those facts, we may not adopt a version of the facts that is blatantly contradicted by video footage that is not doctored or altered in any way and which clearly depicts the events that actually happened.  But we must nonetheless view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.

*Id.* at 438 (cleaned up).  Thus, if a reasonable juror could view the events depicted in a video only one way, that version of the facts must be accepted for purposes of resolving a summary judgment motion.  *See Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Harris*, 550 U.S. at 380).  On the other hand, if a reasonable jury could interpret the events shown in the video multiple ways or if the video does not show all relevant facts, such facts must be viewed in a light most favorable to the non-moving party.  *Id*. (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

3

<u>Spoliation</u>

"Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *United States v. Boxley*, 373 F.3d 759, 762 (6th Cir. 2004) (citing *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999)). Pursuant to its inherent powers, a court may "impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014) (quoting *Adkins v. Wolever*, 554 F.3d 650, 652-53 (6th Cir. 2009)).

To warrant sanctions for the spoliation of evidence, the movant must show: "(1) that the party having control over the evidence had an obligation to preserve it *at the time it was destroyed*; (2) that the records were destroyed with a culpable state of mind;[1] and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (emphasis added) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

---

[1] As discussed *infra*, the 2015 amendments to the Federal Rules of Civil Procedure impacted this second element.

4

The Sixth Circuit has stated that the duty to preserve attaches when the party "has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation." *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216-18 (S.D.N.Y. 2003)).

The term "future litigation" does not mean any possible or hypothetical lawsuit. Instead, it means "reasonably foreseeable" specific litigation. *Zubulake*, 220 F.R.D. at 216 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); *see also United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (finding no spoliation because the defendant was not on notice of a "future specific" lawsuit).

The duty to preserve evidence runs to an identifiable opposing party. *See Town of Westport v. Monsanto Co.*, No. 14-12041, 2015 WL 13685105, at *4 (D. Mass. Nov. 5, 2015) (citing *In re Ethicon, Inc. v. Pelvic Repair Sys. Prod. Antitrust Litig.*, 299 F.R.D. 502, 516 (S.D. W. Va. 2014); *In re Delta-AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1308 (N.D. Ga. 2011); *Point Blank Sols., Inc. v. Toyobo Am., Inc.*, No. 09-61166, 2011 WL 1456029, at *26 (S.D. Fla. Apr. 5, 2011); *Brigham Young Univ. v. Pfizer, Inc.*, 282 F.R.D. 566, 572 (D. Utah 2012)).

Stated differently, the "duty to preserve relevant evidence arises when the party in possession of the evidence knows that litigation *by the party seeking the evidence* is pending or probable." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008) (emphasis added) (citing *Joe Hand Promotions v. Sports Page Cafe*, 940 F. Supp. 102, 104 n.13 (D.N.J. 1996); *Baliotis v. McNeil*, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)); *see also Point Blank Solutions*, 2011 WL 1456029, at *25 (quoting *Kounelis*, 529 F. Supp. 2d at 518); *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 264 F.R.D. 517, 526-27 (N.D. Cal. 2009) (holding that a "general concern over litigation" regarding the product RealDVD did not "create a duty to preserve all documentation related to RealDVD" and that a duty to preserve only arose when "a potential claim was identified or future litigation was probable" with the parties in question). The party asserting spoliation "must first show that [the spoliating party] owed *them* a duty to preserve documents." *In re Delta/Air Tran*, 770 F. Supp. 2d at 1307 (emphasis added).

Effective December 1, 2015, Federal Rule of Civil Procedure 37 was amended to include the following:

> (e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

6

> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  As a result of this amendment, a party seeking the more severe sanction of dismissal, or an adverse inference instruction must show that evidence was destroyed with the "'intent' to deprive [the moving party] of the information's use." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) (quoting Fed. R. Civ. P. 37(e)).  "A showing of negligence or even gross negligence will not do the trick." *Id.* (citing Fed. R. Civ. P. 37, 2015 Advisory Comm. Note).  Moreover, the court may "infer an intent to deprive from [the] defendants' actions" based on the surrounding circumstances.  *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 774 (E.D. Mich. 2019) (quoting *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017)).

## II.   Factual and Procedural Background

On March 5, 2019, Plaintiffs, an interracial-married couple, having made an online reservation through Priceline.com, checked in at the Westin Book Cadillac Hotel in Detroit, Michigan ("the Hotel") for a one-night stay to attend a concert at the Detroit Symphony Orchestra to celebrate Black History Month.[2]  (*See* ECF No.

---

[2] Plaintiff Mosley identifies as Black/African American male, while Plaintiff Wagner identifies as White/Caucasian female. (*See* ECF No. 47 at PageID. 440.)

47 at PageID. 440 ¶ 48.)  Upon arrival at the Hotel, Plaintiffs claim to have been the subject of racial discrimination due to their status as an interracial-married couple.  (*See id.* at ¶117 (i).)  Plaintiff Wagner, who made the online reservation, checked in on behalf of herself and Plaintiff Mosley with the receptionist at the Hotel and was provided two keys to Room 1002.  (*See id.* at ¶¶ 51-55.)  Despite Plaintiff Mosley providing the receptionist his identification at the time of check-in, the reservation listing two occupants to Room 1002, and the receptionist providing two keys, Plaintiff Mosley's name was not listed as an occupant of Room 1002 on the reservation.  (*See id.* ¶ 56.)

Plaintiffs attended the concert and returned to the Hotel. (*See id.* at ¶ 64.) Upon their return, Plaintiff Mosley went to the Hotel's restaurant and ordered a glass of wine, while Plaintiff Wagner retired to Room 1002.  (*See id.*)  Plaintiff Mosley, realizing that he did not have his room key, called Plaintiff Wagner, who indicated that she would leave the door propped open with the latch so he could enter without a key.  (*See id.* at ¶ 67.)

Plaintiff Mosley finished his glass of wine, charged the cost to Room 1002, and headed to the elevator.  (*See id.* at ¶ 68.)  Plaintiff Mosley's cell phone was without power at this time.  (*See id.* at ¶ 70.)  Upon entering the elevator, Plaintiff Mosley realized that he needed a key to access the tenth floor, where Room 1002 was located.  (*See id.* at ¶ 68.)

Plaintiff Mosley went to the Hotel's reception area to obtain a new key for Room 1002 but was informed that he could not be provided with a key as his name was not listed on the reservation.  (*See id.* at ¶ 69.)  Hotel staff attempted to contact Plaintiff Wagner by calling Room 1002 twice, but the calls went unanswered.  (*See id.* at ¶ 70.)  Hotel staff also offered to charge Plaintiff Mosley's phone so he could call Plaintiff Wagner to come to the Hotel lobby.  (*See id.*)  Plaintiff Mosley refused this offer.  (*See id.*)  Plaintiff Mosley requested a staff member escort him to Room 1002 or have a staff member independently check on Room 1002. (*See id.* at ¶ 71.) The Hotel staff refused these requests.  (*See id.*)

Plaintiff Mosley, appearing to grow frustrated with the Hotel staff, "spoke in an elevated tone," in the Hotel lobby.  (ECF No. 75-4 at PageID. 719.)  Hotel staff eventually called two loss prevention officers, Defendants Darryl Jones ("Officer Jones") and Timothy Scott ("Officer Scott") who, based on Plaintiff Mosley's clothing and apparent intoxicated manner of behavior, believed Mr. Mosley to be a "vagrant."  (ECF No. 75-17 at PageID. 818-19.)  Plaintiff Mosley was eventually asked to leave the Hotel.  (*See* ECF No. 47 at PageID. 445 ¶ 75.)

The Hotel's security cameras captured video of Plaintiff Mosley requesting a spare key.  (*See* ECF No. 79-14.)  He appeared visibly frustrated with the staff. (*See id.*)  The cameras also captured Plaintiff Mosley's interaction with Officer Jones.  (*See* ECF No. 79-24.)  While there is no audio, the video appears to show

9

Plaintiff Mosley and Officer Jones involved in a physical altercation outside of the Hotel, beginning with both men bumping chests with each other and ending with Officer Jones in, what appears to be, a boxing or fighting stance with closed fists and squared shoulders with one foot in front of the other.  (*See id.*)

Meanwhile, Officer Scott called 9-1-1 and requested the assistance of the Detroit Police Department ("DPD").  (ECF No. 47 ¶ 84.)  In response to the 9-1-1 operator's question about whether there were weapons involved, Officer Scott responded that Plaintiff Mosley kept "going into his pocket."  (*Id.*)  Officer Scott further stated that he "feared for his life."  (*Id.*)

DPD Officer Edmond Witcher ("Officer Witcher") arrived on the scene. (*See id.* ¶ 85-88.)  Officer Witcher's body camera captured a significant portion of the remaining interaction with both audio and video.  Plaintiff Mosley was placed in a patrol car and was told that there were allegations that he was causing a disturbance and tried to hit a security guard.  (ECF No. 75-26.)

Inside the patrol car, Officer Witcher said to Plaintiff Mosley:  "Stop bringing race into this; race has nothing to do with this."  (ECF No. 69-5, Ex. D.) Plaintiff Mosley responded, "I know."  *Id.*[3]

---

[3] At his deposition, Plaintiff Mosley elaborated on this, stating:

> I was just hoping to deescalate the situation because they felt I was getting upset in the back of the police car.  I was concerned about going

The video from Officer Witcher's body camera shows him going to Room 1002 and speaking with Plaintiff Wagner, who advised Officer Witcher that Plaintiff Mosley is allowed in Room 1002. (*See* ECF No. 69-6, Ex. E.) Thereafter, Officers Witcher, Scott, and Jones proceeded to escort Plaintiff Mosley to Room 1002. (*See* ECF No. 69-8, Ex. G.) The escort party was soon joined by Defendant Christopher Holmes, a Hotel supervisor ("Supervisor Holmes"). (*See id.*) During the escort, Plaintiff Mosley walked through the Hotel lobby with his arms raised above his head, while loudly saying, "hands up, don't shoot." (*See id.*) In response to an officer's question of why he was being so loud, Plaintiff Mosley responded, "because of how y'all treated me. Y'all treated me crazy as hell." (*See id.*)

Once the escort arrived on the tenth floor, Plaintiff Mosley continued to speak in an elevated tone and stated: "I'm gonna sue the shit out of y'all." (*Id.*) Plaintiff Mosley stated two more times that he would be filing a lawsuit. (*Id.*) Plaintiff Mosley then joined Plaintiff Wagner in Room 1002, and the escorting

---

to jail at that point. I figured I just agree with them, and just kind of start defusing the tension would probably be my best path to getting out of this situation, that I was really under a lot of confusion while I was in it.

(ECF No. 75-4 at PageID. 725.)

party (i.e., Supervisor Holmes and Officers Witcher, Jones, and Scott) headed toward the elevator.  (*See id.*)

At some point shortly after, the escort party returned to Room 1002 and advised Plaintiffs that they heard a loud bang from Room 1002 and Plaintiff Mosley was going to be evicted from the Hotel.  (*See* ECF No. 69-9, Ex. H.) Plaintiffs dispute that a loud bang came from their room, claiming the escort party fabricated that there was a noise in retaliation for Plaintiff Mosley's assertion that he would be suing the Hotel.  (*See* ECF No. 75 at PageID. 692.)

Officers Witcher, Jones, and Scott then placed Plaintiff Mosley in handcuffs and removed him from the premises.  (*See id.*)  While they were doing so, Plaintiff Wagner and Officer Witcher became engaged in an altercation, leading to Officer Witcher arresting Plaintiff Wagner.  (*See id.*)

Two days later, on March 8, 2019, counsel for Plaintiffs sent a preservation letter to the Hotel, seeking to preserve all video and audio recordings of Plaintiffs on March 5 and 6, 2019.  (ECF No. 75-6.)

As a result of the above-described events, the Wayne County Prosecutor's Office brought criminal charges against Plaintiffs.  (*See* ECF No. 69 at PageID. 592.)  Plaintiff Mosley was acquitted of all charges.  (*See* ECF No. 75 at PageID. 680.)  Plaintiff Wagner was acquitted on all but one charge, for which there was a hung jury.  (*See id.* at PageID. 681.)  She eventually entered a plea of *nolo*

*contendere* on a reduced charge of Disturbing Meetings, in violation of Michigan

Compiled Laws § 750.170, for which she received a sentence of "delayed six

months [of] . . . non-reporting probation." (ECF No. 69-7 at PageID. 629.)

Plaintiffs thereafter filed this lawsuit against Defendants. In a Third

Amended Complaint filed March 2, 2022, Plaintiffs asserts the following claims:

(I) discrimination under Michigan's Elliott-Larsen Civil Rights Act (ELCRA); (II)

retaliation under the ELCRA; (III) violation of 42 U.S.C. § 1981; (IV) violation of

Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et seq.*; (V) negligence;

(VI) negligence per se; (VII) intentional infliction of emotional distress; (VIII)

assault and battery; (IX) negligent infliction of emotional distress; (X) false arrest;

and (XI) false imprisonment. (ECF No. 47.)

Defendants filed a motion for summary judgment with respect to all of

Plaintiffs' claims.[4] At oral argument, however, Defendants withdrew their

arguments as to Plaintiffs' Count V – negligence and Count VIII – assault and

battery claims. Plaintiffs filed a motion for spoliation sanctions, contending that

Defendants failed to retain certain video evidence after receiving Plaintiffs'

counsel's preservation letter within two days of the incident at issue. While

---

[4] Defendants labeled their motion as one for "partial" summary judgment;
however, the motion argues for dismissal of all of Plaintiffs' claims. (*See* ECF No.
69.)

Defendants do not dispute that certain video evidence was not preserved, they argue that it does not give rise to spoliation.

### III.   Plaintiffs' Motion for Sanctions – Applicable Law & Analysis

Plaintiffs assert that the lost video footage would show three things: (1) Plaintiffs checking in; (2) Plaintiffs leaving for the orchestra; and (3) Plaintiffs returning from the orchestra.  As a sanction, Plaintiffs seek the entry of default against Defendants on Counts I, III, IV, V, and VI, as well as an order striking Defendants' Affirmative Defense No. 6, pertaining to Defendants' argument that Plaintiffs were 50% or more at fault as a result of intoxication.  (*See* ECF No. 86 at PageID. 1158.)

As it pertains to check-in, Plaintiffs argue that the video would demonstrate that the receptionist: (1) made an "askance" look at Plaintiffs; (2) in response to Plaintiffs' request for a king-size bed, responded abruptly: "No, we don't have any"; (3) abruptly asked Plaintiffs in an unfriendly tone: "are you together?" appearing to reference Plaintiffs' status as an interracial married couple, which, Plaintiffs argue, evidences discrimination; and (4) would show Plaintiff Mosley providing identification to the receptionist at check-in.  (*See* ECF No. 86 at PageID. 1114-15.)

As an initial matter, this video would have shown only the back of the receptionist, as the Hotel's camera was located behind the reception desk and did

not include audio, consistent with similar surveillance footage that has been produced in this case.  (*See, e.g.,* ECF No. 69-2, Ex. A.)  As a result, the only potential prejudice to Plaintiffs from the loss of the "check-in" surveillance video would be evidence that Plaintiff Mosley provided identification to the receptionist. The video would not capture the receptionist's facial expression or tone of voice. Defendant Hotel Investors of Michigan, Inc. has agreed to stipulate that the receptionist made an "askance" look at Plaintiffs, and that Plaintiff Mosley provided identification during check-in  (*See* ECF No. 87 at PageID. 1230.)  This stipulation would not bind the other parties, however.

The prejudice Plaintiffs face from the lack of video of their check in is minimal. There is no material dispute that Plaintiff Mosley provided his ID to the receptionist, and video of this would not bolster Plaintiffs' claims. "Faced with bad conduct but minimal prejudice, courts are understandably reluctant to impose the most severe sanctions, especially case-dispositive ones." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 515 (D. Md. 2010).

Plaintiffs argue that the lost video footage of them leaving for, and returning from, the orchestra, would show that they were not intoxicated when they returned to the Hotel.  (ECF No. 86 at PageID. 1157.)  Plaintiffs maintain that this would undermine Defendants' affirmative defense that one or both of the Plaintiffs were impaired by liquor or a controlled substance, rendering them 50% or more at fault

15

for the subject incidents.  (*See* ECF No. 59 at PageID. 533.) Plaintiffs assert that they are unable to present evidence to rebut this defense due to Defendants' failure to preserve the video footage.  (*See* ECF No. 86 at PageID. 1157.)

Defendants argue that the video footage is immaterial because there is DPD body camera footage supporting Plaintiffs' intoxication.  (*See* ECF No. 87 at PageID. 1231 ("Defendants have body cam video from the [DPD] showing that Plaintiff Wagner appeared intoxicated"); *see also id.* ("Similarly, Defendants have body cam video from the [DPD] showing Plaintiff Mosley in what appeared to be an intoxicated state."))

The Court finds that the failure to preserve these videos does not result in prejudice to Plaintiffs.  Defendants' failure to preserve the video footage is concerning—particularly when the request was made within 48 hours of the events at issue.  However, Plaintiffs' argument that their ability to rebut Defendants' allegations that they were intoxicated is unconvincing.  There is video of the events after Plaintiffs returned from the concert, including video of Plaintiff Mosley requesting a replacement key, his interaction with the security officers, being escorted to Room 1002, and eviction from the Hotel.  Additional video of Plaintiffs walking through the Hotel lobby after the concert—even if there was nothing unusual about them doing so—would not rebut other evidence that they were intoxicated.  For these reasons, Plaintiffs' motion for spoliation is denied.

16

## IV.   Defendants' Motion for Summary Judgment – Applicable Law & Analysis

### Propriety of Plaintiffs' Claims Against CFA and Starwood

In their motion for summary judgment, Defendants argue that CFA and Starwood are not proper parties to this action because CFA did not employ any person involved in the subject events, and Starwood sold the Hotel to Marriott two to three years before the subject incident.  (*See* ECF No. 69 at PageID. 593.) In response, Plaintiffs argue that there was a principal-agent relationship between CFA and Westin, and that Starwood trained, disciplined, and provided the policies for the Hotel's employees.  (ECF No. 75 at PageID. 681-82.)  In their reply brief, Defendants do not address Plaintiffs' arguments for holding CFA liable and argue, only, that Starwood is not a proper party.  (*See* ECF No. 84 at PageID. 1113.)  The Court presumes, therefore, that Defendants have abandoned their argument that CFA is improperly named.

In support of their argument that Marriott's acquisition of the Hotel did not relieve Starwood of liability, Plaintiffs cite to Starwood's training and discipline and policy records from employment files, including those of Defendants Jones and Scott.  (*See* ECF No. 75-33.)  These records predate Starwood's sale of the Hotel to Marriott, however.  Therefore, Plaintiff fails to show that Starwood was responsible for the conduct of the employees at the Hotel on the date of the

incident in March 2019.  As a result, the Court grants summary judgment in

Starwood's favor.

ELCRA and § 1981 Discrimination and Retaliation Claims (Counts I, II & III)

Section 1981 prohibits intentional race discrimination in the making and

enforcing of contracts involving public and private actors.  42 U.S.C. § 1981(a).

The statute's protections extend to "the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and

conditions of the contractual relationship."  *Id.* § 1981(b).  The ELCRA prohibits

discrimination in public accommodations and public services based on certain

protected characteristics, including race.  Mich. Comp. Laws § 37.2302.

Discrimination and retaliation claims under both statutes are analyzed similarly to

claims brought under Title VII of the Civil Rights Act of 1964.  *See Rogers v.*

*Henry Ford Health Sys.*, 897 F.3d 764, 771 (6th Cir. 2018) (citations omitted)

("We review claims of alleged race discrimination [and retaliation] brought under

§ 1981 and [ELCRA] under the same standards as claims of race discrimination

brought under Title VII.").

"A plaintiff may establish a claim of discrimination [or retaliation] either by

introducing direct evidence of discrimination, or by proving circumstantial

evidence which would support an inference of discrimination."  *Johnson v. Univ.*

*of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (alteration added) (citing *Kline v.*

*Tenn. Valley Auth.*, 127 F.3d 337, 348 (6th Cir. 1997)).  Plaintiffs do not have direct evidence of discrimination and, therefore, rely on circumstantial evidence.

In this instance, the burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies.  *See Rogers*, 897 F.3d 771. The plaintiff first must establish a prima facie case of discrimination or retaliation. *Id.* at 772 (citation omitted).  The defendant then has the burden of proffering a legitimate, nondiscriminatory or nonretaliatory reason for its decision.  *Id.* (citation omitted).  If the defendant does so, the plaintiff then must prove that the reasons offered by the defendant were a pretext for discrimination or retaliation. *Id*. (citation omitted).

Generally, pretext can be shown by evidence that: (1) the proffered reason has no basis in fact; (2) the articulated explanation did not actually motivate the adverse action; or (3) the stated reason was insufficient to motivate the action. *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Hostettler v. College of Wooster*, 895 F.3d 844, 858 (6th Cir. 2018)). The ultimate burden, however, remains with the plaintiff to convince the factfinder that the defendant retaliated against the plaintiff for engaging in protected activity.  *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014).

*a. Plaintiffs' Prima Facie Case*

*i. Discrimination under ELCRA and Section 1981 (Counts I and III)*

Because "[c]ourts use the same burden-shifting analysis . . . to analyze claims brought pursuant to ELCRA and section 1981," both discrimination claims will be analyzed in this section. *Chambers v. City of Detroit*, 786 F. Supp. 2d 1253, 1263 (E.D. Mich. 2011).

To prevail on a discrimination claim under the public accommodation section of the ELCRA, a plaintiff must demonstrate: (1) discrimination based on a protected characteristic; (2) by a person; (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations; (4) of a place of public accommodation.[5] *See Carter v. Shearer*, 596 F. Supp. 3d 934, 955 (E.D. Mich. 2022) (citing *Haynes v. Newshewat*, 729 N.W.2d 488, 492 (Mich. 2007)).  To establish the first element, Plaintiffs "may prove either intentional discrimination or disparate treatment by Defendant[s]." *Sanders v. Sw. Airlines, Co.*, 86 F. Supp. 2d 749, 744 (E.D. Mich. 2000). "Disparate treatment may be proved by showing that plaintiff is a member of a

---

[5] "Place of public accommodation" means a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.  Mich. Comp. Laws § 37.2301.

protected class and was treated differently than persons of a different class for the same or similar conduct." *Id.*

However, "[a]s an alternative to showing differing treatment, in the commercial establishment context, the plaintiffs can also establish a prima facie case of discrimination by showing that they received service in a 'markedly hostile manner . . . [that] a reasonable person would find objectively discriminatory.'" *Keck v. Graham Hotel Sys., Inc.*, 566 F.3d 634, 641 (6th Cir. 2009) (quoting *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001)). "This test has been adopted to allow a plaintiff 'to state a claim when similarly situated persons are not available for comparison, as will be often the case in the commercial establishment context.'" *Carter*, 596 F. Supp. 3d at 956 (quoting *Christian*, 252 F.3d at 873).

The three-pronged test articulated in *Christian*, applicable to both ELCRA and § 1981 commercial establishment claims, requires Plaintiffs to demonstrate that they: (1) are members of a protected class; (2) sought to make or enforce a contract for services ordinarily provided by the defendant; and (3) were denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) the plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) the plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find

objectively discriminatory.  *See Christian*, 252 F.3d at 872; *see also Carter*, 596 F. Supp. 3d at 956-57 (applying *Christian*'s test to ELCRA public accommodations claim).

Courts consider three factors when determining whether a defendant's conduct was markedly hostile – whether the conduct was: (1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on its face, that the conduct supports a rational inference of discrimination.  *See Christian* 252 F.3d at 871.

The first two elements are satisfied. Plaintiffs are an interracial-married couple and members of a protected class, and they sought accommodations at the Hotel, a service that is ordinarily provided. Plaintiffs argue that they were treated in a markedly hostile manner which a reasonable person would find objectively discriminatory. (ECF No. 75 at PageID. 683.) Plaintiffs argue the following conduct is the result of discrimination:  (1) Defendants Nyyota Holmes and Shauna Burton's exclusion of Plaintiff Mosley as a registered guest of the Hotel; (2) Defendants Erica Drew and Dovley Shyhmyradov denying Plaintiff Mosley access to his room after requesting a spare key; (3) the Hotel's security ejecting Plaintiff Mosley; and (4) Defendants' Jones' and Scott's statements to the DPD. (ECF No.

47 ¶ 117.) Viewing the facts most favorably to Plaintiffs, they have failed to establish a prima facie case of discrimination.

Looking at the conduct as it pertains to check-in, Plaintiffs argue that Defendants failed to be helpful, friendly, and accommodating during check-in and were dismissive of Plaintiffs' relationship. (ECF No. 75 at PageID. 685-86.) They further state that Defendants' failure to place Plaintiff Mosley's name on the reservation was the result of discrimination.   (*Id.* at PageID. 685-86.)

Defendants' alleged error in putting the names of the occupants on the reservation for the one-night stay does not produce an inference of discrimination. Defendant Nyyota Holmes testified that Hotel staff typically ask registered guests staying multiple nights if they would like to add anyone to the Hotel's registration as "if they get separated, it will avoid having issues with getting a replacement key if their guest needs one." (ECF No. 75-10 at PageID. 746.)  She acknowledged that guests staying only one night could also get separated and request a spare key, and that putting the names of all registered guests on the reservation would be a "good idea." (*Id.*)  Defendant Nyyota Holmes further testified that asking the registered guest with a booking of only one-night if they would like any other names on the reservation is "something that I don't do." (*Id.*)  In addition, while Plaintiff Mosley provided his identification during check-in, neither he nor Defendant Nyyota Holmes recall whether this was in response to a request for his

23

identification. (*See id.* at PageID. 747; *see also* ECF No. 75-4 at PageID. 717.)

Defendant Burton testified that the Hotel "leave[s] it to the guest to let [them]

know who is registered to the room."  (ECF No. 75-11 at PageID. 751.)

While leaving the burden on the guest to inform the Hotel of the registered

occupants may not be the best practice in hotel operations or guest

accommodations, it is neither profoundly contrary to the manifest financial

interests of the merchant, nor so far outside of widely-accepted business norms,

nor does it give rise to a rational inference of discrimination as required to

establish marked hostility.  Defendants' conduct during check-in was not markedly

hostile to Plaintiffs.  *See, e.g.*, *Christian*, 252 F.3d at 867 (finding plaintiff, an

African-American woman, had sufficiently plead marked hostility after

defendant's employee incorrectly believed that she had placed an item in her purse

and reported her alleged shoplifting to police); *Carter*, 596 F. Supp. 3d at 957

(finding plaintiff, an African-American woman, had sufficiently plead marked

hostility where her debit card was declined but defendant's employee accused

plaintiff of using a stolen card, resulting in plaintiff being detained by police).

Looking at the conduct after the orchestra, Defendants' conduct of not

giving him a spare key, calling the police, and removing him from the Hotel was in

response to Plaintiff Mosley's behavior. Plaintiff Mosley appeared uncooperative

with the Hotel staff while trying to acquire a second key, resulting in his

preliminary ejection from the Hotel. Defendants' statement to police that Plaintiff was "going into his pocket" similarly does not give rise to an inference of racial discrimination. Plaintiff Mosley and the Hotel security then engaged in a physical altercation. Plaintiffs' eviction from the Hotel does not give rise to an inference of discrimination. Plaintiffs have failed to establish a necessary element of these claims. As a result, Defendants are entitled to summary judgment on these claims.

### ii. Retaliation (Count II)

To prevail on a retaliation claim under the ELCRA, a plaintiff must demonstrate that: (1) the plaintiff engaged in protected activity; (2) the defendant was aware the plaintiff engaged in that activity; (3) the defendant took an adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted); *see also Woods v. Washtenaw Hills Manor, Inc.*, No. 07-15420, 2009 WL 728537, at *13 (E.D. Mich. Mar. 19, 2009) (Standards for retaliation claim under Michigan's Whistleblower Protection Act ("WPA") similar to Title VII and ELCRA").

A reasonable juror could find these elements satisfied here. Plaintiff Mosley was engaged in protected activity – declaring his intent to sue the Hotel. *See Robinson v. Radian, Inc.*, 624 F. Supp. 2d 617, 627-28 (E.D. Mich. 2008) (citation omitted) (One is "engaged in protected activity under the WPA if he has reported,

25

or is about to report, a suspected violation of law to a 'public body'"); *see also*

Mich. Comp. Laws § 15.361(d)(*i*) (defining "public body" as a "state officer,

employee, agency, department, division, bureau, board, commission, council,

authority, or other body in the executive branch of state government.")

Hotel staff were aware that he was engaged in this activity, and then took an

adverse action by evicting Plaintiffs. All of these actions occurred close in time.

*See Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 472-73 (6th Cir. 2002) (citing

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) ("[T]he fact that

retaliation occurs 'very close' in time after a person engages in conduct protected

by Title VII may suffice to satisfy the causal connection requirement."); *see also*

*Humenny v. Genex Corp.*, 390 F.3d 901, 906 ("Cases brought pursuant to the

ELCRA are analyzed under the same evidentiary framework used in Title VII

cases."). The statements that Plaintiff Mosley was going to sue the Hotel could be

viewed as opposing illegal activity and "these statements are appropriately left to

interpretation by the trier of fact." *Bromley v. Parisian, Inc.*, 55 F. App'x 232, 237

(6th Cir. 2002).

### *b. Defendants' Legitimate Reason*

Defendants argue that there was a legitimate, non-discriminatory reason for

evicting Plaintiffs. Specifically, Plaintiff Mosley's "own belligerent behavior" and

the 'loud bang' Hotel staff and DPD officers heard coming from Plaintiffs' room.

(ECF No. 69 at PageID. 591, 596, 598, 601.) Plaintiffs, in response, argue that the 'loud bang,' did not actually occur and was merely pretextual for Plaintiffs' eviction, as the true cause of the eviction was Plaintiff Mosley's complaints of discrimination and threats to sue. (ECF No. 75 at PageID. 692.)

Viewed in a light most favorable to Plaintiffs, there was no 'loud bang' from there room, and Hotel staff did not decide to evict Plaintiffs solely because of Mosley's claimed belligerent behavior. Defendants state that when Plaintiff Mosley and the escort party reached Room 1002, Plaintiff Wagner coerced Plaintiff Mosley inside and the escort party walked away. (ECF No. 69 at PageID. 591.) Thereafter, Defendants claim a loud noise was heard inside the room, and, in response to the loud noise, Supervisor Holmes asked Officer Witcher to evict Plaintiff Mosley. (*Id.*) A jury will have to decide these questions of fact. Therefore, Defendants are not entitled to summary judgment on this claim.

<u>Discrimination Under 42 U.S.C. § 2000a (Count IV)</u>

Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, reads: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a.  The statute contains an administrative exhaustion requirement:

27

> In the case of an alleged act or practice prohibited by this subchapter which occurs in a State . . . which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice . . . upon receiving notice thereof, no civil action may be brought under subsection (a) before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

42 U.S.C. § 2000a-3(c); *see also Watson v. Fraternal Ord. of Eagles*, 915 F.2d 235, 242 (6th Cir. 1990) (explaining that Title II's exhaustion requirement "requires that plaintiffs refer their complaint to a state agency for resolution before proceeding in federal court. The state must have a chance to resolve the dispute if it has a law on the subject"). Defendants seek summary judgment as to this claim, arguing that Plaintiffs failed to exhaust their administrative remedies and only injunctive relief is available under the statute. (*See* ECF No. 69 at PageID. 601-02.)

Plaintiffs' initial Complaint, filed March 1, 2021, did not include their Title II claim. (*See* ECF No. 1.) In a letter dated March 31, 2021, Plaintiffs informed the Michigan Department of Civil Rights that they would be amending their pleading to add a claim for violations of Title II. (*See* ECF No. 75-35.) More than 30 days later, on June 4, 2021, Plaintiffs filed a First Amended Complaint which included this claim. (*See* ECF No. 18.) This satisfies the notice requirement. *See Bormuth v. Dahlem Conservancy*, 837 F. Supp. 2d 667, 673 (E.D. Mich. 2011) ("While

28

there is no requirement that the plaintiff exhaust their administrative remedies, they are required to provide notification."); *see also Paschal v. Drs. Assocs.*, No. 17-1635, 2017 WL 4155768, at *3 (N.D. Ohio Sept. 9, 2017) (same).

Moreover, Defendants are correct that Title II allows Plaintiffs injunctive relief only. *Watson*, 915 F.2d at 242 (citing *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402 (1968) (per curiam)).[6] Plaintiffs do not identify what form of injunctive relief they are seeking or would be appropriate in this case. (*See* ECF No. 47 at ¶ 146.) There are no facts suggesting Plaintiffs will seek accommodation from the Hotel in the future or an incident such as this will reoccur. As a result, Defendants are entitled to summary judgment on this claim.

Negligence Per Se (Count VI)

Plaintiffs allege that Defendants committed negligence per se because Defendants violated a Michigan statute, Michigan Compiled Laws § 125.783. "Michigan does not adhere to the doctrine of negligence per se." *Campbell v. Nationstar Mortg.*, 611 F. App'x 288, 299 (6th Cir. 2015) (citation omitted); *see also Zeni v. Anderson*, 243 N.W.2d 270, 276 (Mich. 1976) ("It is true that a number of passages in cases speak of negligence per se almost in terms of strict

---

[6] To the extent Plaintiffs seek any other form of relief, such is not permitted by statute. *See* 42 U.S.C. § 2000a-3(a).

liability, but closer examination of the application of the rule reveals that Michigan does not subscribe to such a harsh dogma.").

Rather, the violation of a statute simply "creates a prima facie case from which a jury may draw an inference of negligence." *Zeni*, 243 N.W.2d at 273; *see also Rupert v. Daggett*, 695 F.3d 417, 428 (6th Cir. 2012) (quoting *Klanseck v. Anderson Sales & Serv., Inc.*, 393 N.W.2d 356, 360 (Mich. 1986)) ("Under Michigan law, negligence per se does not mandate strict liability but rather 'creates a rebuttable presumption of negligence.'"); *Longstreth v. Gensel*, 377 N.W.2d 804, 813 (Mich. 1985) (citing *Zeni*, 243 N.W.2d at 283); *Hardy v. Monsanto Enviro-Chem Sys., Inc.*, 323 N.W.2d 270, 277 (Mich. 1982) (indicating that "the trial court should instruct that violation of [a] statute constitute a prima facie case of negligence, rather than negligence as a matter of law").

This Court rejects Plaintiffs' contention that the Michigan Supreme Court reached a different conclusion recently in *Meyers v. Rieck*, 983 N.W.2d 747 (Mich. 2022). The issue of whether a plaintiff can assert a negligence per se claim based on the violation of a statute was not before the Court in *Meyers*. Instead, the issue was whether the violation of one of the defendant's standing orders sounded in negligence or medical malpractice. *Id.* at 750. The Michigan Supreme Court held the latter but also held that a standing order cannot establish the standard of care

for such an action. *Id.* Thus, any statement by the Court that breach of a statute "establishes negligence per se," *id.* at 754, was dicta.

Further, *Meyers* was decided on July 7, 2022. In cases decided after *Meyers*, the Michigan Court of Appeals has reiterated their position that Michigan does not subscribe to the doctrine of negligence per se. *See Ferriole v. City of Detroit*, No. 358794, 2022 WL 3009812, at *7 n.2 (Mich. Ct. App. July 28, 2022) (quoting *Randall v. Mich. High Sch. Athletic Ass'n*, 965 N.W.2d 690, 721 (Mich. Ct. App. 2020)) ("Michigan law does not subscribe to the doctrine of negligence per se."); *see also Batton v. Auto Owners Ins.*, No. 363258, 2023 WL 4982158, at *2 (Mich. Ct. App. Aug. 3, 2023) (internal quotations and alterations omitted) ("Violations of administrative rules or regulations do not constitute negligence per se but may provide evidence of negligence.").

For these reasons, the Court grants summary judgment in favor of Defendants on Plaintiffs' negligence per se claim.

Intentional and Negligent Infliction of Emotional Distress (Counts VII & IX)

Michigan courts have recognized the torts of intentional and negligent infliction of emotional distress. *See House of Providence v. Meyers*, 458 F. Supp. 3d 621, 641 (E.D. Mich. 2020) (collecting cases). Both torts require proof that the plaintiff suffered severe emotional distress or a severe mental disturbance. *See*

*Lucas v. Awaad*, 830 N.W.2d 141, 150 (Mich. Ct. App. 2013) (citations omitted). Plaintiffs fail to offer evidence to support this element of their claims.

Plaintiffs state in their Complaint that, as a result of Defendants' actions, they "suffered severe emotional distress." (*See* ECF No. 47 at ¶ 171.) However, Plaintiffs provide no evidentiary support for this allegation in response to Defendants' summary judgment motion. (*See generally* ECF Nos. 75-2 and 75-4.)

As a result, these statements are unsupported and merely conclusory. "It is now quite well-established that, in order to withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position; a mere 'scintilla of evidence' is insufficient." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (citing *Liberty Lobby*, 477 U.S. at 252). The Sixth Circuit has explained that "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009) (citation omitted); *see also Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (finding that "conclusory statements" unsupported by specific facts will not permit a party to survive summary judgment).

Thus, the Court is granting summary judgment to Defendants on Plaintiffs' intentional and negligent infliction of emotional distress claims.

<u>False Arrest and False Imprisonment (Counts X & XI)</u>

Plaintiffs assert false arrest and false imprisonment claims on behalf of Plaintiff Mosley, only.  (*See* ECF No. 75 at PageID. 697.)  The claims are based on his detention in the police car once DPD officers arrived and arrest and removal from the Hotel.  (*See id.*; *see also* ECF No. 47 at PageID. 471-72.)  Defendants argue that they are entitled to summary judgment with respect to these claims because: (a) they did not arrest or detain Plaintiff Mosley; and (b) the DPD police officers' arrest and detention of Plaintiff Mosley were legally justified even if based on allegedly incorrect information from any named defendant.  For this second reason, Defendants rely on *Lewis v. Farmer Jack Division, Inc.*, 327 N.W.2d 893 (Mich. 1982).

To establish their claim of false arrest or false imprisonment, Plaintiffs must show the absence of probable cause.  *See Brewer v. Perrin*, 349 N.W.2d 198, 201 (Mich. Ct. App. 1984), *abrogated on other grounds by Odom v. Wayne Cnty.*, 760 N.W.2d 217 (Mich. 2008); *see also Odom*, 760 N.W.2d. at 229 ("[A] claim of false arrest or false imprisonment cannot be sustained if the arrest was legal.").  Probable cause to arrest is determined by whether the "facts available to the police at the moment of arrest would have justified a fair-minded person of average intelligence and judgment in believing that [the arrestee] had committed a felony." *People v. Goeckerman*, 337 N.W.2d 517, 521 (Mich. Ct. App. 1983).

"The validity of an arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).  Moreover, "[i]n determining whether probable cause to arrest exists, the knowledge of the arresting officers, not the suspect, is determinative." *Smith v. Thornburg,* 136 F.3d 1070, 1077 (6th Cir. 1998).

However, contrary to Defendants' reading of *Lewis*, the legality of an arrest or detention is not necessarily a bar to an action for false arrest or false imprisonment if the arrest or detention was in response to false information provided by a citizen defendant.  *See Lewis*, 327 N.W.2d at 905 (explaining that "grounds for an action for false arrest would still exist against the individual who intentionally accused the innocent person since the defendant instigated the arrest without legal justification.  Therefore, the legality of the arrest is not necessarily a bar to maintaining an action for false arrest or false imprisonment") (internal citations omitted); *see also Carter*, 596 F. Supp. 3d at 952 (quoting *Lewis*, 327 N.W.2d at 234-35) ("Where a 'private citizen summons a police officer and intentionally gives him false information accusing another of a felony and [ ] the officer, reasonably acting on this false information, arrests the innocent person, the

arrest would be [found] lawful,' but the citizen may be held liable for instigating the arrest without legal justification.").

### a. Count X – False Arrest

First, as it pertains to Plaintiff Mosley being escorted out of the hotel by police, there is a genuine issue of material fact as to the cause. "A plaintiff need not be found guilty to validate probable cause," but the arrest has to be without legal justification. *Combs v. City of Detroit*, No. 06-12678, 2008 WL 11472185, at *3 (E.D. Mich. June 19, 2008). Furthermore, while "[a] valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent," *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988), "[t]he crucial element in an action for false arrest or false imprisonment *is not* that the arrest or detention was unlawful[,]" but "whether the defendant had legal justification to arrest or detain the plaintiff," *Lewis*, 327 N.W.2d at 893 (emphasis added).

As it pertains to legal justification, it is a question of fact for the jury whether Officer Witcher – who executed the arrest – independently heard the "loud bang," which instigated Plaintiff Mosley's arrest, or only received information about the noise from Supervisor Holmes, or the other Officers. If Officer Witcher did not rely on information from a Hotel employee, Defendants are entitled to summary judgment. If Officer Witcher only knew about the noise from Hotel employees, it becomes a jury question of whether this information was false. As

discussed previously, there is a question of fact on whether the loud bang actually occurred.

### b. Count XI – False Imprisonment

The elements of false imprisonment are: (1) an act committed with the intention of confining another; (2) the act directly or indirectly results in such confinement; and (3) the person confined is conscious of his confinement. *See Moore v. Detroit*, 652 N.W.2d 688, 691 (Mich. Ct. App. 2002) (quoting *Adams v. Nat'l Bank of Detroit*, 508 N.W.2d 464, 468 (Mich. 1993)). The restraint must have occurred without probable cause to support it. *See Peterson Novelties v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003) ("To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, *i.e.*, the arrest was not based on probable cause.").

Plaintiffs argue that Defendants' false statements resulted in the police imprisoning Plaintiff Mosley in the back of their police car. (*See* ECF No. 47 ¶¶ 195-96.) The Court finds a genuine issue of material fact as to whether false information received from Hotel employees by the DPD police officers caused the officers to place Plaintiff Mosley in the police car.

Officer Scott told the 911 operator that he feared for his life and that Plaintiff Mosley kept going into his pocket. (*See* ECF No. 47 at PageID. 448 ¶ 84.) Further, Officer Scott told police that Plaintiff Mosley was harassing

36

employees and guests and also tried to hit someone.  (*See* ECF No. 75-37; *see also* ECF No. 75-18 at PageID. 826.)  There is evidence reflecting that the DPD officers relied on these statements when deciding to place Plaintiff Mosley in the police car.  Specifically, the body camera video shows that, while being detained in the back of a DPD police car, one of the officers told Plaintiff Mosley that he could not exit the vehicle because "the primary unit has to figure out what's going on.  Right now, there's allegations that you tried to hit the security guard and were causing a disturbance."  (ECF No. 75-26.)

There is a genuine issue of fact as to whether these statements that Plaintiff Mosley was harassing and trying to hit someone are true.  (*See* ECF No. 75 at PageID. 698 ("Because of the false statements by Jones and Scott to the police officers, the officers immediately took a position adverse to Mr. Mosley and placed him in the back of the police car.")  Further, Plaintiffs have presented evidence that Plaintiff Mosley was the victim of assault and battery by Defendants, not the aggressor.[7]  (*See* ECF No. 75-22 (Defendant Scott pushing door on Plaintiff Mosley); ECF No. 75-23 (Defendant Jones in a fighting stance with Plaintiff Mosley).)

---

[7] The Court previously noted that Defendants are not seeking summary judgment on Plaintiffs' assault and battery claim.

As explained in *Lewis*, "grounds for an action for false arrest [or false imprisonment] would still exist against the individual who intentionally accused the innocent person since the defendant instigated the arrest without legal justification.  Therefore, the legality of the arrest is not necessarily a bar to maintain an action for false arrest or false imprisonment."  *Lewis*, 327 N.W.2d at 903 (alteration added).  Given that there is a genuine issue of material fact as to whether the statements made to the DPD were true, which resulted in Plaintiff Mosley's imprisonment in the DPD's police car, Defendants are not entitled to summary judgment on this claim.

## V.     Conclusion

For the reasons discussed, the Court is denying Plaintiffs' motion for sanctions. The Court is granting summary judgment in favor of Defendant Starwood.  The Court further grants summary judgment to Defendants on Plaintiffs' ELCRA discrimination claim (Count I), 42 U.S.C. § 1981 discrimination claim (Count III), Title II discrimination claim (Count IV), negligence per se claim (Count VI), and intentional and negligent infliction of emotions distress claims (Counts VII & IX). The Court finds a genuine issue of material fact precluding summary judgment as to Plaintiffs' remaining claims.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (ECF

No. 69) is **GRANTED IN PART AND DENIED IN PART** in that Defendant

Starwood is **DISMISSED AS A PARTY** and Counts I, III, IV, VI, VII and IX are

**DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for sanctions (ECF

No. 86) is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 21, 2024